**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SELMA MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| NISSAN MOTOR ACCEPTANCE CORP.; | ) | |
| ASSETSBIZ CORP.; EXPERIAN | ) | |
| INFORMATION SOLUTIONS, INC.; and | ) | JURY TRIAL DEMANDED |
| EQUIFAX INFORMATION SERVICES, INC. | ) | |

## CLASS ACTION COMPLAINT

### Introduction

1.      Plaintiff Selma Martinez seeks, individually and in Count V on behalf of two classes of similarly situated consumers, to recover damages arising out of a finance company's tortious mishandling of a consumer automobile account.

2.      After its affiliated dealership failed to comply with the law in offering the consumer contract at issue, the defendant finance company placed Plaintiff in a position of being effectively unable to make timely payment on her loan, refused to address its own errors in handling the account, wrongfully declared her in default, and repossessed her automobile in bad faith.

3.      In addition to being treated unfairly by the finance company, the defendant repossession company wrongfully and tortiously withheld Plaintiff's personal property, including necessary medications.

1

4.      Moreover, the defendant credit reporting agencies failed to comply with the Fair Credit Reporting Act when Plaintiff disputed information associated with this account, caused her further damage and/or exacerbated the existing damage to her credit.

**Parties**

5.      Plaintiff Selma Martinez is a citizen of Illinois and resides within this district.

6.      Defendant Nissan Motor Acceptance Corp. ("NMAC") is a California corporation that is regularly engaged in the business of automobile financing and/or the purchasing of automobile finance contracts in this district.

7.      Defendant AssetsBiz Corp. ("AssetsBiz") is an Illinois corporation regularly engaged in the business of automobile repossessions in this district.

8.      Defendant Equifax Information Services, LLC ("Equifax") is Georgia corporation with its principal place of business in Atlanta, Georgia.  Equifax is a subsidiary of Equifax, Inc., and is regularly engaged in the business of credit reporting services in this district.

9.      Defendant Experian Information Solutions, Inc. ("Experian") is an Ohio corporation with its principal place of business or headquarters in Lyndhurst, Ohio.  Experian is a subsidiary of Experian, PLC, a United Kingdom corporation, and is regularly engaged in the business of credit reporting services in this district.

**Jurisdiction and Venue**

10.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d), and 15 U.S.C. § 1681p.  Supplemental jurisdiction over Plaintiff's state law claims exists under 28 U.S.C. 1367(a).

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as the acts and transactions that give rise to this action occurred, in substantial part, in this district.  Venue is

also proper in this district since Defendants transact business in this district and the activities giving rise to Plaintiff's cause of action occurred exclusively or primarily in this district.

## Factual Allegations

12.     On June 27, 2015, Selma Martinez executed a bill of sale with Star Nissan for the purchase of a 2015 Nissan Murano with VIN 5N1AZ2MH0FN237388 ("the Murano"). Attached as Exhibit A is a copy of the Bill of Sale.

13.     Because Ms. Martinez's credit rating was relatively high, at the time in the 730-740 range, she was offered 0% financing from Star Nissan.

14.     The Murano was to be used for personal and household uses.

15.     From the outset, the loan documents prepared by Star Nissan contained multiple errors. The bill of sale lists the wrong down payment amount – Ms. Martinez in fact put $7,000 down on her car, but the bill of sale only lists $5,000 – and the sales tax records Star Nissan completed on June 27 identify the car as an Infiniti and not a Nissan.  See Exhibit B.

16.     The bill of sale further references an attached Retail Installment Contract ("RIC"). However, no RIC was in fact executed on June 27.  Exhibit A.

17.     Instead, Star Nissan had Ms. Martinez return on June 30, 2015, to complete the remaining paperwork in connection with the financing of the Murano.

18.     Upon information and belief, it was the assigned finance manager's first loan processing for Star Nissan.

19.     During an inexplicably lengthy three hour session of trying to get the paperwork in order, with multiple interruptions, Ms. Martinez was never presented a completed copy of the full RIC to review in its entirety and sign as contemplated by Illinois law.

20.     Instead, Star Nissan had her purportedly sign an electronic pad multiple times in between being presented "versions" of the purported RIC to fill in the signature boxes and be stored on Star Nissan's computer system.

21.     The electronic pad and computer program did not allow her to effectively read, review, or understand what part of the contract she was signing or how she was signing her name.

22.     Star Nissan did not give Ms. Martinez a copy of the completed and signed RIC in any form on June 30, 2015.

23.     In the weeks following June 30, Ms. Martinez was not given any other information as to where or how to make her regular monthly payments, such as a mailing address or account number, and indeed did not even know at the time who her purported finance company even was.

24.     With her first regularly scheduled payment due on August 11, and having received nothing from Star Nissan or any finance company regarding payment, Ms. Martinez began efforts to determine to whom she should tender her monthly payment, her corresponding account number, and/or how to otherwise make said payments, including a call to Star Nissan on August 1, 2015.

25.     Having received no return call or information about her finance company, Ms. Martinez had no reasonable method of making her first scheduled payment.

26.     Even had she somehow sent a payment to the proper party, her payment would not have been applied to her account, as she subsequently learned that the finance company, NMAC, had no record of her loan at that time.

27.     Starting on August 24, 2015, Ms. Martinez began aggressive efforts at resolving the issue, as well as attempting to obtain copies of the documents she purportedly signed at the dealership that she did not have.  These efforts included at least six (6) calls to Star Nissan on the 24th.

28.     At some point during her calls on the 24th, she learned from the dealership that NMAC might be her finance company and likewise began calling them as well.

29.     On August 25, 2015, she made five (5) additional calls to Star Nissan and she had a sixteen-minute call with NMAC, where a representative was unable to find any account that matched Ms. Martinez's information.

30.     Late on August 25, Rebecca at Star Nissan contacted Ms. Martinez to advise her that they were working on learning her account number from NMAC.

31.     Even after discovering that NMAC was her purported lender, Ms. Martinez was not able to access NMAC's computerized records system either telephonically or online, as she did not have an account number and the system did not recognize her social security number.

32.     On August 30, 2015, Ms. Martinez sent a fax to Star Nissan reiterating that she needed her account number in order to try and set up payments to the finance company.

33.     Ms. Martinez continued her efforts through early September.  Further, Ms. Martinez retained an attorney to try and gain some traction in resolving her ongoing issues before any correspondence or response was made by NMAC.  The attorney's calls, likewise, generally went unanswered and did not resolve the issues.

34.     Ms. Martinez finally received a "welcome letter" from NMAC dated September 4, 2015.  The "welcome letter" had an incorrect address and indicated that she would receive her

first statement "soon," weeks after her first payment was purportedly due.  A copy of the "welcome letter" is attached as <u>Exhibit C</u>.

35.     On September 16, 2015, Ms. Martinez pulled her credit report and learned that NMAC had already reported her as delinquent for over 30 days, even though she had no way of previously paying the account, and indeed was initially not even sure of her creditor's identity when the reported delinquency arose.

36.     Ms. Martinez received a subsequent statement dated September 18, 2015, that indicated that her next payment was due on October 11, 2015.  A copy of this letter is attached as <u>Exhibit D</u>.

37.     The statements received are confusing as to which address Ms. Martinez would have mailed any payment to, as they provide separate addresses for regular monthly payments and "Miscellaneous Fees and Other Charges."  *See* <u>Exhibit D</u>.

38.     During this entire time, Ms. Martinez was still unable to access NMAC's phone or online system to make her payments.

39.     As Ms. Martinez had no way of timely making her first two payments because of NMAC's frustration of any effort on her part, Ms. Martinez sought to make any payment and additional payment necessary to bring the account current, subject to not being charged late fees, not having the payments considered late, or not having a negative entry on her credit file.

40.     On or around September 25, 2015, Ms. Martinez was contacted by a collection agent for NMAC; again, she tried to explain her issues and find reasonable resolution with NMAC.  The collection agent instead threatened to "disable" the vehicle if she did not pay, with no assistance offered as to her ongoing issues.

41.     On October 19, in light of NMAC's inability to provide meaningful guidance or resolution, Ms. Martinez went to Star Nissan in person to meet with the finance manager Vitaly Kheifets.

42.     Mr. Kheifets contacted NMAC directly in the presence of another manager, Dalila Dedic, to try and resolve issues regarding the loan's servicing.

43.     While looking at his computer screen, which upon information and belief had access to NMAC's records, Mr. Kheifets indicated to NMAC, Ms. Dedic, and Ms. Martinez that the loan had not been processed until August 30, 2015, two months after the purported contract and after NMAC had apparently reported that Ms. Martinez was delinquent in repayment of the loan.

44.     Mr. Kheifets intimated that NMAC was at fault, specifically saying that "this can't be her fault; you guys didn't process the loan…" in the presence of Ms. Martinez and Ms. Dedic.

45.     During the same call, NMAC again refused to settle matters and provided Ms. Martinez with the name of "Gerren Sanders" to discuss her ongoing issues further.

46.     Before Mr. Sanders returned Ms. Martinez's call, sometime on the night of October 21 or the morning of October 22, 2015, AssetsBiz repossessed the Murano on behalf of NMAC.

47.     Upon information and belief, NMAC had placed the car for repossession prior to the October 11 due date provided to her on the first statement she received.

48.     Upon information and belief, NMAC had an active repossession order for the vehicle while on the three-way call with Ms. Martinez, her attorney, and Star Nissan on October 19.

49.    At a minimum, NMAC had an opportunity to pull the repossession order after the October 19 call where its authorized dealer, Star Nissan, confirmed that Ms. Martinez was not at fault for the delayed payments while looking at NMAC's internal records.

50.    However, NMAC deliberately chose not to rescind said order and proceeded with the repossession despite actual knowledge that its own records, and indeed its own authorized agent, confirmed that NMAC was at fault for frustrating Ms. Martinez's payment attempts.

51.    On October 22, 2015, during a three-way call with her attorney and NMAC, Ms. Martinez offered to pay the account in full with additional amounts to cover future months on the condition that NMAC not consider the payments late and report the account as paid on time to the credit bureaus, in light of her consistent efforts to make payment.

52.    NMAC refused to accept Ms. Martinez's payments on the condition that they not be considered late and that NMAC would verify the account balance, next payment amount, future due date, account number, and mailing address for payments in writing.

53.    Ms. Martinez also regularly requested documents related to the loan, as she had never received anything from the dealer or finance company.

54.    NMAC, however, refused to provide Ms. Martinez with confirmation of the prospective amount due after she made payments of all accrued amounts, despite the account having a 0% interest rate.

55.    Moreover, it was not until November 12, 2015, after the repossession, that NMAC provided Ms. Martinez with a copy of the RIC that she supposedly signed on June 30, 2015.

56.    Star Nissan has never provided Ms. Martinez with copies of RIC that she purportedly signed on June 30, 2015.

57. At all relevant times, Ms. Martinez kept a separate accounting of funds sufficient to pay the balance of all amounts lawfully due on the Murano, and has been ready and willing to do so at all times. At one point, Ms. Martinez even inquired at her bank about setting up an escrow account for NMAC's benefit upon NMAC removing any delinquency and late charges and, eventually, returning the vehicle in good condition.

58. Additionally, after having her vehicle repossessed, Ms. Martinez sought to retrieve her personal property that was inside the Murano at the time of the repossession.

59. As she was in the middle of moving residences at the time, Ms. Martinez had a variety of important personal effects in the Murano, including copies of essential prescription scripts, her personal copies of vital medical records, and multiple prescription medications that included Schedule II narcotics and other necessary medications for which she had a finite supply.

60. AssetsBiz does not list the location where it stores personal property for recently repossessed automobiles online or with the Illinois Commerce Commission.

61. Ms. Martinez called AssetsBiz on October 22, 2015, the day after the repossession, to learn the location of her vehicle and personal property, but AssetsBiz refused to provide said location.

62. Facing serious potential health issues from being deprived of her medication and prescription scripts if she exhausted her supply, Ms. Martinez again contacted AssetsBiz on October 24, 2015, to learn the location of her vehicle and personal property, but AssetsBiz again refused to provide said location.

63. AssetsBiz never provided Ms. Martinez with notice of the location of her vehicle and property, and particularly did not do so in writing within five working days of the repossession.

64.     On the contrary, AssetBiz actively worked to conceal the location of Ms. Martinez's vehicle and property by suggesting that it would bring part of her property to a local train station, where she could retrieve it from them.

65.     Several days later, when Ms. Martinez again attempted to recover her medically necessary property, AssetsBiz hung up on her while she was trying to explain the urgency of the situation.

66.     On October 28, 2015, Ms. Martinez finally learned the location of her vehicle and personal property from a local police department after explaining her urgent medical needs and AssetBiz's total refusal to assist her.

67.     On October 28, Ms. Martinez was able to recover her prescription scripts and medical records; however AssetsBiz did not give her any of her actual medications.

68.     Despte Ms. Martinez's requests, AssetsBiz did not provide Ms. Martinez with an inventory of her personal property at that time.

69.     On November 20, Ms. Martinez contacted AssetsBiz to get a log of her personal property still being stored with AssetsBiz. AssetsBiz refused to provide any such inventory.

70.     On November 24, in response to a communication made by Ms. Martinez's attorney, "Chris," a purported manager at AssetsBiz, called Ms. Martinez and claimed that it was illegal to provide her with a log of her own personal property.

71.     "Chris" further claimed Ms. Martinez was being "difficult" for seeking the return of her personal property and accused Ms. Martinez of purposefully attempting to evade the repossession (which she did not reasonably expect to happen), claiming that NMAC and its agents had been looking for Ms. Martinez's vehicle in Yakima, Washington.

72. On December 3, 2015 – six weeks after her automobile was repossessed – Ms. Martinez finally was able to retrieve all of her personal property and was finally given an inventory of her items.

73. The inventory provided to her is dated November 24, 2015, and lists her address as being located in Yakima, Washington.

74. That inventory is materially incomplete, as it does not mention the prescription scripts, medications, or health records that were in the vehicle at the time of the repossession.

75. The inventory provided to Ms. Martinez is further undated and unsigned, despite being ostensibly completed under the penalty of perjury.

76. As a result of the unfair practices by Defendants, Ms. Martinez's FICO Credit Score dropped from around 740 to a low of 604 in the span of six months.

77. Ms. Martinez has further suffered significant damages in terms of paying transportation fares and other costs incurred in having to find an alternative means of transit.

78. Additionally, NMAC has started sending Ms. Martinez notices of delinquency for the vehicle, claiming that she now owes $9,827.97 as of August 15, 2016. **[UPDATE]**

79. Neither Ms. Martinez nor her counsel have received a notice of intended disposition, as required by 810 ILCS § 5/9-611, identifying the date and method of disposition of the collateral.

80. Ms. Martinez has further suffered additional actual damages, including lost rent on a condominium in the city that she has had to retain due to not having a vehicle, damages to her personal and business finances, and damages related to her credit rating being severely decreased, including denial of her credit application to purchase a replacement vehicle.

81.     Ms. Martinez has further suffered actual damages in the form of exacerbation of existing health issues and symptoms, frustration, mental anguish, and emotional distress.

82.     Ms. Martinez has further suffered actual damages in the form of permanently being deprived of various medications as well as the temporary severe distress and mental anguish associated with potentially not having access to same.

**COUNT I**
*Individual claim against AssetsBiz for violations of the*
*Fair Debt Collection Practices Act*

83.     Plaintiff restates, realleges, and incorporates paragraphs 1 - 82 as if fully set forth herein.

84.     The Fair Debt Collection Practices Act, 15 U.S.C. § 1692a *et seq.* ("FDCPA"), outlaws unfair and deceptive practices in the collection of consumer debt.

85.     AssetsBiz is a "debt collector" pursuant to the FDCPA, 15 U.S.C. § 1692a(6), as a company that regularly enforces security interests by repossessing collateral for purported debts.

86.     The FDCPA, 15 U.S.C. § 1692f, broadly prohibits "unfair or unconscionable means to collect or attempt to collect any debt."

87.     The FDCPA, 15 U.S.C. § 1692f(6), specifically prohibits the "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if...there is no present right to possession of the property claimed as collateral through an enforceable security interest."

88.     AssetsBiz violated the FDCPA, and in particular 15 U.S.C. § 1692f(6), through its conversion of Ms. Martinez's Schedule II narcotics by taking property in which it had no enforceable security interest..

89.     AssetsBiz violated the FDCPA, and in particular 15 U.S.C. § 1692f(6), through its unlawful failure to provide the location of Ms. Martinez's personal property, essentially denying her access to property in which it had no security interest or right of continued possession.

90.     Moreover, Star Nissan and NMAC failed to comply with Illinois law regarding the origination of the loan.  In particular, the purported signing of the RIC did not comply with the Illinois Motor Vehicle Retail Installment Sales Act, 815 ILCS § 375/1 *et seq.*

91.     As a result, the RIC is of no legal effect and NMAC never became a valid lienholder.

92.     Because NMAC must be construed as not having had a valid lien, AssetsBiz violated 15 U.S.C. § 1692f(6) by repossessing collateral which it had no right to lawfully repossess.

93.     Further, as a repossession agency, AssetsBiz's conduct is regulated by the Illinois Collateral Recovery Act, 225 ILCS § 422 *et seq.* ("CRA")

94.     The CRA mandates particular procedures to be followed when an agent repossesses an automobile containing personal property, including the providing of notice within five working days and the taking of a complete and accurate inventory.  *See* 225 ILCS § 422/110.

95.     AssetsBiz's conduct as described herein violated the CRA in such a manner that must be construed as violating the FDCPA by taking nonjudicial action over property not subject to a security interest.

96.     AssetsBiz more generally violated the FDCPA by committing objectively unfair practices under 15 U.S.C. § 1692f.

WHEREFORE, Plaintiff respectfully requests judgment be entered against AssetsBiz and award damages as follows:

a)   Statutory damages as provided under 15 U.S.C. § 1692k;
b)   Actual damages to be proven at trial;
c)   Attorney's fees, expenses, and costs incurred;
d)   Any other relief this Court deems just and proper.

### COUNT II
*Individual claim against AssetsBiz for violations of the*
*Illinois Consumer Fraud and Deceptive Business Practices Act*

97.     Plaintiff restates, realleges, and incorporates paragraphs 1 - 82 as if fully set forth herein.

98.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, ("ICFA"), prohibits, *inter alia*, deceptive and unfair conduct, representations, and omissions.

99.     Under the ICFA, an unfair act or practice is one that: (a) offends public policy; (b) is immoral, unethical, oppressive or unscrupulous; or (c) causes substantial injury to consumers.

100.     Defendant's actions constitute an unfair act or practice in, at minimum, the following ways:

(a) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, to repossess a vehicle outside of compliance with the CRA;

(b) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, to repossess a vehicle on which there is no lawful lien;

(c) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, to refuse to provide the location of an owner's personal property;

(d) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, to refuse to provide an owner with a complete and accurate inventory of personal property retained; and

(e) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, for repossession agents to convert an owner's personal property while in its possession.

14

101.     Defendant acted willfully, recklessly, maliciously, and with intent to injure Plaintiff and/or a reckless disregard for Plaintiff's rights.

102.     Defendant's misconduct occurred during the course of Illinois trade and commerce.

103.     The CRA is an expression of the public policy of Illinois.

104.     The CRA, § 411/110(c) states that:

> If personal effects or other property not covered by a security agreement are contained in or on a recovered vehicle at the time it is recovered, then the personal effects and other property not covered by a security agreement must be completely and accurately inventoried....

105.     The CRA, § 411/110(d), further requires that the repossession agency provide notice to the owner of personal property within five working days of the location of said personal property:

> Within 5 working days following the date of repossession, the licensed repossession agency shall give written notification to the debtor of the whereabouts of personal effects or other property inventoried.

106.     AssetsBiz failed to comply with said provisions of the CRA.

107.     Because AssetsBiz's failures to comply with the CRA invoke consumer protection concerns and directly harmed an Illinois consumer, such violations constituted unfair practices under the ICFA.

108.     Moreover, AssetsBiz's practice of refusing to tell consumers the location of their personal property constitutes an unfair practice under the ICFA.

109.     Additionally, AssetsBiz's conversion of Ms. Martinez's medications from her personal property while in its possession constitutes an unfair practice under the ICFA.

110.     AssetsBiz's conduct was done in such a manner that warrants the imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests judgment be entered against AssetsBiz and award damages as follows:

a) Actual damages to be proven at trial;
b) Punitive damages pursuant to 815 ILCS § 505/10a
c) Attorney's fees, expenses, and costs incurred;
d) Any other relief this Court deems just and proper.

## COUNT III
*Individual claim against AssetsBiz for Conversion*

111.     Plaintiff restates, realleges, and incorporates paragraphs 1 - 82 as if fully set forth herein.

112.     Ms. Martinez had rights in her personal property, including her medications and prescription scripts.

113.     AssetsBiz had no lawful interest, security or otherwise, in Ms. Martinez's personal property.

114.     Under Illinois law, Ms. Martinez had a right to immediate possession of her personal property upon demand and payment of any reasonable administrative expenses.

115.     Ms. Martinez demanded possession of her personal property on multiple occasions, including continual efforts to determine where AssetsBiz stored her possessions.

116.     AssetsBiz wrongfully controlled Ms. Martinez's personal property by refusing to tell her the location of her personal property, thus depriving her of any opportunity to retrieve such property, including medications and prescription scripts necessary to refill her medications.

117.     AssetsBiz wrongfully controlled Ms. Martinez's personal property by refusing to provide her with a log of her property retained in its custody.

118.     AssetsBiz wrongfully controlled Ms. Martinez's personal property by permanently depriving her of the possession or use of her medications in the vehicle, specifically Schedule II narcotics and other medications necessary for her health and well-being.

119.     AssetsBiz's conduct was done intentionally and without regard to Ms. Martinez's rights, health, or well-being, and warrants the imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests judgment be entered against AssetsBiz and award damages as follows:

   a) Actual damages to be proven at trial;
   b) Punitive damages;
   c) Costs incurred;
   d) Any other relief this Court deems just and proper.

## COUNT IV

*Individual claim against NMAC, Experian, and Equifax for*
*Violations of the Fair Credit Reporting Act*

120.     Plaintiff restates, realleges, and incorporates paragraphs 1 - 82 as if fully set forth herein.

121.     The Fair Credit Reporting Act, 15 U.S.C. § 1681a *et seq.* ("FCRA") provides various consumer protections in the context of credit reporting.

122.     Defendants Equifax and Experian are "consumer reporting agencies" as defined at 15 U.S.C. § 1681a(e).

123.     Defendant NMAC is a "furnisher" of credit reporting information pursuant to 15 U.S.C. § 1681s-2.

124.     Under the FCRA, a consumer reporting agency has the obligation to follow reasonable procedures to assure "maximum possible accuracy of the information concerning the individual." 15 U.S.C. § 1681e(b).

125.    Section 1681i(a)(1) of the FCRA requires that a consumer reporting agency conduct a reinvestigation upon notice of any dispute with the accuracy of reported information and delete any such information that cannot be confirmed within thirty (30) days.

126.    At the completion of the reinvestigation as contemplated by 15 U.S.C. § 1681i(a)(6) the consumer reporting agency must provide a statement explaining the results of the investigation and various consumer rights pertaining to same.

127.    Section 1681i(a)(7) further provides a right to the consumer to receive an explanation of the reinvestigation procedure and supporting documents used in the reinvestigation upon request.

128.    Section 1681s-2(b) of the FCRA requires that, upon notice of a dispute with regards to information submitted to a consumer reporting agency, that the furnisher of the information must conduct an investigation and modify, correct, or otherwise delete inaccurate information.

129.    NMAC's reporting of any delinquency that began in August of 2015 was knowingly and intentionally inaccurate because NMAC had not even processed the account information and had not provided any possible mechanism for Ms. Martinez's payment.

130.    Moreover, any such negative credit report is inaccurate as NMAC's own conduct completely frustrated and repudiated any possible obligation by Ms. Martinez.

131.    Ms. Martinez disputed this account information in its entirety via certified mail to all defendants listed in this Count on December 16, 2015, in an attempt to correct the erroneous reporting.  A copy of the letter is attached as Exhibit E.

132.    Defendant Experian acknowledged the dispute via a letter on December 30, 2015.

However, Experian failed to complete its reinvestigation in a timely manner as required by the statute. As of February 1, 2016, Plaintiff had not received any further notice from Experian and the negative credit information remained on her Experian credit file.

133. Plaintiff's most recent Experian credit report shows that as of February 1, 2017, NMAC had charged off the $6,531.00 disputed balance on Plaintiff's account as uncollectable debt.

134. Defendant Equifax responded on or about January 14, 2016, that it had investigated and "verified that this item belongs to you." Moreover, on the basis of its investigation, Equifax stated only that it had deleted "historical information" without identifying what historical information was deleted. In substance, the credit report entry remained unchanged in spite of Ms. Martinez's dispute. Exhibit F.

135. Further, despite Plaintiff's request, Equifax did not timely provide Plaintiff with an explanation of the methods used to reinvestigate the claim as contemplated by Section 1681i(a)(7).

136. As of February 1, Plaintiff had not received further notice from Equifax and the negative credit information remained on her Equifax credit file.

137. Furthermore, both Equifax and Experian failed to appropriately mark Plaintiff's account as disputed after notice of her dispute, and indeed both had updated her credit entry for this account on or after January 1, 2016.

138. As a result, both Equifax and Experian failed in their statutory duties under the FCRA.

139.     Additionally, NMAC failed in its duties under the FCRA by failing to timely correct the inaccurate information in Plaintiff's credit files with Equifax and Experian as required by 15 U.S.C. § 1681s-2(b).

140.     Defendants' noncompliance with the FCRA was willful.

141.     In the alternative, Defendants' noncompliance with the FCRA was negligent.

142.     As a result of Defendants' noncompliance and/or delays in properly reporting credit information, Ms. Martinez suffered actual damages to be proven at trial.

WHEREFORE, Plaintiff respectfully requests judgment be entered against NMAC, Experian, and Equifax and award damages as follows:

a)  Statutory damages as provided under 15 U.S.C. § 1681n(a)(1)(A);
b)  Actual damages to be proven at trial;
c)  Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);
d)  Attorney's fees, expenses, and costs incurred;
e)  Injunctive relief to correct Plaintiff's credit file and bar further negative reporting related to this account;
f)  Any other relief this Court deems just and proper.

## COUNT V

*Individual and Class Claim against NMAC for*
*Violations of the Illinois Consumer Fraud and Deceptive Practices Act*

143.     Plaintiff restates, realleges, and incorporates paragraphs 1 - 82 as if fully set forth herein.

### Class Allegations

144.     Plaintiff brings this Count V on behalf of herself and two Classes of similarly situated individuals, referred to herein as Class A and Class B.

145.     Class A consists of all consumers with an address in Illinois who, according to NMAC's records, in the three years prior to the filing of this lawsuit, were sent an affidavit of

defense containing language materially identical or substantially similar to the affidavit of defense at issue in this Complaint. A copy of said affidavit of defense is attached as <u>Exhibit G</u>.

146. Class B is a subclass of Class A consisting of Illinois consumers who in fact paid to have the affidavit of defense notarized and/or returned to the creditor via certified mail. Plaintiff is a member of both Class A and Class B.

147. The claims asserted on behalf of <u>Class A</u> satisfy the requirements of Rule 23 because they are based upon a form document that, upon information and belief, was sent to a sufficiently large number of consumers over the course of the last three years to make joinder unfeasible.

148. The claims asserted on behalf of <u>Class B</u> satisfy the requirements of Rule 23 because they are based on similar payments made in reliance upon a form document in such a large number over the course of the last three years to make joinder of all such parties unfeasible.

149. The claims asserted on behalf of Class A and Class B satisfy the requirements of Rule 23 because there are questions of law and fact common to the class and those questions predominate over any questions affecting only individual class members. The principal question presented by this claim is whether NMAC's use of <u>Exhibit G</u> constitutes a violation of the Illinois Consumer Fraud Act.

150. The only individual issue is the identification of the class members and determination of damages. This is a matter capable of ministerial determination based upon a review of NMAC's records and an individual determination of damages can be performed easily in this case because once liability for the use of an improper form has been established, NMAC's own records will reflect the amount obtained from the improper sale of each of the subject vehicles.

151.   Moreover, the damages for members of Class B are capable of ministerial determination as they are based on uniform payment amounts established by governmental units or regulations.

152.   The claims asserted on behalf of <u>Class A</u> and <u>Class B</u> satisfy Rule 23 because Plaintiff will fairly and adequately represent the class members' interests and has retained counsel experienced in bringing class actions and claims under the Illinois Consumer Fraud Act.

153.   The claims asserted on behalf of <u>Class A</u> and <u>Class B</u> satisfy Rule 23 because employment of the class action method in this case is the most appropriate method for the fair and efficient adjudication of this controversy.

154.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, ("ICFA"), prohibits, inter alia, deceptive and unfair conduct, representations, and omissions.

155.   Under the ICFA, an unfair act or practice is one that: (a) offends public policy; (b) is immoral, unethical, oppressive or unscrupulous; or (c) causes substantial injury to consumers. In effectuating "self-help" repossession, NMAC was subject to a number of duties that otherwise would not exist if it had sought the aid of the Courts.  Those duties can be found in the Illinois Vehicle Code ("IVC"), 625 ILCS § 5/3-114.

156.   Under Section 3-114(f-5)(2) of the IVC, NMAC is obligated as a lienholder to send the purported debtor an affidavit of defense for any vehicle that is used primarily for personal, family, or household purposes.

157.   Pursuant to Section 3-114(f-5)(2), if the consumer returns the affidavit of defense, the lender must go through a court process to determine possession of the vehicle and transfer title.

158.    There is no requirement under section 3-114(f-5) that the consumer must obtain a notarization of his or her affidavit of defense in order for the affidavit of defense to be considered valid by the creditor.

159.    Moreover, there is no requirement under section 3-114(f-5) that the consumer must return the affidavit of defense by certified mail in order for the affidavit of defense to be considered valid by the creditor.

160.    As there is no requirement under 625 ILCS § 3-114(f-5) that the consumer must obtain notarization of the affidavit of defense or return it using certified mail in order for it to have legal validity, NMAC's inclusion of such requirements for its form affidavit of defense, attached as Exhibit G, is an unfair and misleading representation to consumers that the affidavit of defense needs to be notarized or returned via certified mail to protect their interests and defenses to the transfer of title.

161.    NMAC intended that Plaintiff and the members of the proposed class rely on its representations contained in its affidavit of defense.  NMAC's representations are made the course of trade or commerce.

162.    NMAC is unlawfully advantaged by the additional requirements as it may deter consumers from exercising their rights under Illinois law.

163.    Consumers who have obtained notarization of the affidavit or returned it via certified mail, including Plaintiff, did so as a direct and proximate result of NMAC's representations contained in Exhibit G.  As such, all members of Class B – those who paid for notary services or certified mail – were damaged in the amount of the notary fee and/or the cost of certified mailed, among other damages.

164.     Plaintiff, individually and on behalf of all members of Class B, seeks a reimbursement of fees paid to notaries or for certified mail for consumers taking these unnecessary steps.

165.     Moreover, Plaintiff seeks a declaration that such a notice is invalid and an injunction pursuant to Section 10 of the ICFA for members of Class A who have not returned the affidavit of defense.  Plaintiff seeks an order from the Court enjoining NMAC from selling any vehicles belonging to members of Class A until a proper notice is sent, affording class members an opportunity to respond to proper notice.

166.     As NMAC's affidavit of defense is immoral, unscrupulous, unethical, and unfair because it contains hurdles that do not exist under the law, the notices must be held as void and all actions resulting from the use of such notices are void.

167.     As such, Plaintiff further seeks a refund of all money derived from the sale of vehicles utilizing this affidavit of defense and/or a voiding of any deficiency amounts due. NMAC's conduct is deploying a deliberately unlawful affidavit to deter consumers from exercising their rights was willful or intentional and done with evil motive or reckless indifference to the rights of others.

WHEREFORE, Plaintiff asks that this Court certify the aforementioned Classes, enter judgment in favor of Plaintiff, Class A, and Class B against NMAC and award:

a) Actual damages to be proven at trial;
b) Injunctive relief as described herein;
c) Punitive damages for NMAC's blatantly illegal conduct;
d) Reasonable attorneys' fees and costs; and
e) Any other relief this Court deems just and proper.

## COUNT VI

*Individual claim against NMAC for Violations of the*
*Illinois Consumer Fraud and Deceptive Business Practices Act*

168.    Plaintiff restates, realleges, and incorporates paragraphs 1 - 82 as if fully set forth herein.

169.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, ("ICFA"), prohibits, inter alia, deceptive and unfair conduct, representations, and omissions.

170.    Under the ICFA, an unfair act or practice is one that: (a) offends public policy; (b) is immoral, unethical, oppressive or unscrupulous; or (c) causes substantial injury to consumers.

171.    Defendants' actions constitute an unfair act or practice in, at minimum, the following ways:

> (a) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, for a lender to accept assignment of finance contracts from a corporate affiliate where it knows or has reason to belief that the corporate affiliate is in violation of Illinois law in its completion of RICs;

> (b) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to neglect to process a loan for two months after accepting assignment of the loan;

> (c) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to declare an account delinquent or in default prior to processing the loan and sending the alleged debtor a welcome letter;

> (d) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to refuse to provide consumers with a reasonable means to timely pay a consumer loan;

> (e) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to refuse to take corrective action when notified that its own negligence or misconduct created a purported default;

(f)  it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to declare a consumer loan account in default with actual knowledge that it failed to timely process the loan and frustrated payment efforts;

(g)  it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to refuse to provide an account statement that verifies the amount due upon the payment of all purported amounts lawfully due;

(h) it is immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy for a lender such as NMAC to repossess an automobile with actual knowledge that the lender is at fault for the default and that the customer had adequate funds to pay the purported balance upon reasonable conditions.

(i) it immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, for a lender such as NMAC to assess a deficiency balance against a consumer for a vehicle where payments were frustrated such that the loan should be considered void, no accurate notice of intended disposition was provided, and the creditor willfully delayed in disposing of the vehicle in a manner that substantially lowered its value.

172.    Defendant acted willfully, recklessly, maliciously, and with intent to injure Plaintiff and/or a reckless disregard for Plaintiff's rights.

173.    Defendant's misconduct occurred during the course of Illinois trade and commerce.

WHEREFORE, Plaintiff respectfully requests judgment be entered against NMAC and award damages as follows:

a)  Actual damages to be proven at trial;
b)  Punitive damages pursuant to 815 ILCS § 505/10a
c)  Attorney's fees, expenses, and costs incurred;
d)  Any other relief this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action so triable.

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that Defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If Defendants are aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendants.

Respectfully submitted,

By: /s/ Lance A. Raphael
One of Plaintiff's Attorneys

Lance A. Raphael
Craig R. Frisch
Consumer Advocacy Center, P.C.
180 West Washington, Suite 700
Chicago, IL 60602(312) 782-5808